IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KIRSTEN McKEE,

                Plaintiff,

      v.

MADISON AREA TECHNICAL COLLEGE,

                Defendant.

OPINION AND ORDER

13-cv-181-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Kirsten McKee suffers from a condition called essential tremor, which involves involuntary shaking of her head. From 2010 to 2012, she was a student at defendant Madison Area Technical College in a program for physical therapy assistants, but she left the program after she failed a practical exam twice. In this case brought under the Americans with Disabilities Act, the Rehabilitation Act and state law, plaintiff alleges that defendant engaged in a series of discriminatory and retaliatory actions that led to her leaving the school. In particular, she says that one of her instructors, Jane Stroede, mistreated her when her tremor caused her to lose her balance during a skills assessment and then, after plaintiff complained about the mistreatment, Stroede put her on an improvement plan and changed her score on one exam and caused her to fail two others.

Defendant has filed a motion for summary judgment, dkt. #17, which is ready for review. To prevail on her claims, plaintiff must show that defendant discriminated against

1

her because of a disability or because she exercised her federally protected rights.  Although I have doubts that plaintiff has shown either that she is disabled or that she engaged in protected activity, I need not resolve those questions because I conclude that no reasonable jury could find that defendant discriminated or retaliated against plaintiff.

It may be that Stroede was unduly harsh with plaintiff during the skills assessment, but that is not enough to prevail on a claim under the ADA or the Rehabilitation Act. The undisputed facts show that plaintiff failed her exams because she made mistakes that implicated patient safety and that school policy required plaintiff to be dismissed from her course after she failed the same test twice.  She has not adduced admissible evidence of any similarly situated student, disabled or nondisabled, who received more favorable treatment. It is questionable whether Stroede's other actions are sufficiently adverse to sustain an independent claim, but even if they are, plaintiff's evidence of discriminatory intent simply is too thin to defeat defendant's motion for summary judgment. In accordance with 28 U.S.C. § 1367(c)(3), I am remanding plaintiff's state law claims for breach of contract and negligent infliction of emotional distress to state court.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.


UNDISPUTED FACTS

In 1988 or 1989, plaintiff Kirsten McKee was given a diagnosis of a neurological condition called essential tremor, which causes an involuntary shaking of her head.

2

Plaintiff's condition is not related to a more serious neurological condition, such as Parkinson's disease.  Plaintiff's tremors can affect her handwriting, her voice, her balance and her ability to eat and swallow, particularly in stressful situations.

In 2010, plaintiff began attending Madison Area Technical College, taking general education classes. In January 2011, she began the physical therapist assistant program.  She did not identify herself as disabled to defendant and she did not request any accommodations.

In plaintiff's first semester in the program, she enrolled in two classes taught by Jane Stroede; in the fall 2011 semester she took one class taught by Stroede.  She received an A in two of the classes and an AB in the third class.

In the spring 2012 semester, plaintiff again enrolled in two classes taught by Stroede: Principles of Neuromuscular Rehabilitation and Clinical Practice.  On February 1, 2012, plaintiff took a written exam for Neuromuscular Rehabilitation.  After that exam, plaintiff took a lab skills "check-off."  (The parties dispute whether Stroede told the class that the lab skills assessment was a graded exam.)  During the exercise, students worked in groups of two or three to practice the skills while other groups were being tested.  One student would play the role of the patient and the other the role of the therapist.  Stroede moved from group to group to assess the students' skills.

Plaintiff had difficulty maintaining her balance while she was practicing because of her head tremor. While Stroede was assessing another group of students, she noticed plaintiff standing and bending from left to right, swinging her arms and almost falling to

3

each side, as if on a balance beam.  She was laughing and talking loudly.

Stroede approached plaintiff "with a stern look on her face."  Plt.'s Dep., dkt. #14, at 57-58.  Stroede "imitated the position that [plaintiff] was holding" and "exaggerated the moves that [plaintiff] was doing."  Id.  (Plaintiff uses the word "mocking" throughout her proposed findings of fact and brief, but that is a conclusory term, so I have included plaintiff's more specific description instead.  E.g., Gessert v. United States, 703 F.3d 1028, 1035 (7th Cir. 2013) (on motion for summary judgment, refusing to consider conclusory allegations that actions were " abrupt," "threatening," "erratic" and "aggressive").)

Stroede asked plaintiff, "Are you kidding?  Are you just messing around?"  Plaintiff answered, "No, this is me. I'm having a problem balancing."  Stroede asked plaintiff to stop and asked the other students to get back on track.  Stroede returned to assessing the other students.   One student said to Stroede, "We all know Kirsten's got the head tremor.  Could that have anything to do with her inability to balance today?"  (The parties do not say whether Stroede knew about plaintiff's tremor before February 1 or whether Stroede believed that plaintiff's problem with balancing was caused by her tremor.  However, Stroede testified that she believed that plaintiff should have stepped out of her standing position if she was having trouble balancing rather than engage in what Stroede believed was disruptive and unprofessional behavior.  Stroede Dep., dkt. #16, at 87.)

When it was plaintiff's turn to be assessed as a therapist, she became flustered because of the previous incident and she excused herself from the class to compose herself.  She then returned and finished the exercise.

4

After class, plaintiff spoke to Stroede about what happened. (The parties dispute whether plaintiff told Stroede that she did not have good balance and was not faking.) Stroede told plaintiff that her conduct was unprofessional and disruptive and "that's something we'll have to talk about." Stroede Dep., dkt. #16, at 26. (In her deposition, plaintiff testified that Stroede told her that she has "some sort of soul searching to do" and that, if plaintiff "couldn't handle this, there was no way [she] was going to be able to handle the clinical setting." Plt.'s Dep., dkt. #14, at 63. Again, plaintiff also uses conclusory terms such as "hostile" and "accusatory," which are not helpful. In her declaration, plaintiff adds that Stroede stated that plaintiff "had an issue" and "needed to think about what that was.") After plaintiff accused Stroede of mocking her, Stroede told plaintiff to go home and they would talk about it later. Plaintiff did not discuss her tremors during her conversations with Stroede.

Stroede called Wendy McNall, the program director, to discuss what happened. Stroede said that plaintiff had been so upset that it made Stroede uncomfortable. (The parties dispute whether Stroede told McNall that she believed plaintiff might have "some undiagnosed neurological condition."). McNall was aware that plaintiff suffered from tremors.

The following day, plaintiff went to McNall's office to talk about what happened with Stroede. Plaintiff stated that she was still upset because Stroede had mocked her and implied that plaintiff was "faking." McNall told plaintiff that she believed that Stroede had acted unprofessionally and inappropriately. After getting permission from plaintiff, McNall

contacted the dean about plaintiff's concerns and let Stroede know that she had done so. (The parties do not say what McNall told the dean or whether he took any action in response.)

Later that day, Stroede sent an email to plaintiff, explaining that she had failed the exam and would need to meet with Stroede to discuss a plan of remediation.  In addition, Stroede wrote the following:

> We will also need to meet to address your actions during the exam and your approach to me after the exam as well as your dissatisfaction with my response to you as your instructor at that time. This is a two way interaction. Your perception of the circumstances and responses in question are important and will be considered by me in an open and honest manner. My perception of the circumstances and responses in question as well as my expectations of a 2nd year PTA student are equally as important and hopefully will be considered in the same open and honest manner.
>
> Prior to this meeting you will want to review the student handbook, the clinical manual, the syllabus for both Neuro and Clinical Practice 1, as both professional behaviors and exam failure results impact clinical placement. I would also welcome a third party to accompany you if that would be desired by you.

Stroede spoke with four other instructors about plaintiff to determine whether the February 1 incident was isolated or part of a larger problem.  Three of the four instructors stated that plaintiff was having stress management issues.

At an unspecified time, plaintiff "successfully remediated the . . . exams she had previously failed on February 1."  Dfts.' PFOF ¶ 87, dkt. #30.

On February 9, 2012, plaintiff, Stroede and McNall met to discuss the February 1 incident.  At the meeting, Stroede told plaintiff that she was being put on a "Step 2" professional behaviors plan and discussed the need for plaintiff to develop a plan to address

6

her stress management issues.

Under defendant's policy, a professional behaviors plan may be implemented when a student does not exhibit one or more basic skills, including critical thinking, communication, problem-solving, interpersonal skills, responsibility, professionalism, use of constructive feedback, effective use of time and resources, stress management, and commitment to learning. Step 1 of a behaviors plan involves notifying the student by saying something to them or putting something in writing that acknowledges that the student is having difficulties. At Step 2, the student and instructor are to identify a course of action to resolve the concern, a method of tracking progress, and a schedule of periodic meetings between student and program faculty to document current status. Step 1 may be skipped if there are multiple incidents occurring or if the occurrence is extreme enough that it needs to be dealt with immediately.

On February 20, 2012, plaintiff took another written exam in the Neuromuscular Rehabilitation class. Initially, Stroede gave plaintiff a grade of 84, but when Stroede rechecked the exams she discovered she had made a calculation error and the score should have been 82.

According to the student handbook, exam scores under 78 require remediation. (Remediation may include an additional assignment, research, test analysis or open discussion of the topic to insure improvement.) However, Stroede sent the class an email in which she stated that scores of 82 or lower would require remediation and that she "encourage[d] everyone to do their own remediation, regardless of [his or her] score."

Several students in the class received scores of 82 or less, including at least one other student who scored an 82.

On February 22, 2012, plaintiff took a practical skills exam in the Neuromuscular Rehabilitation course.  Stroede played the role of a patient who had suffered from a stroke. Part of the exam required plaintiff to secure a gait belt, but plaintiff failed to secure the belt correctly, even after Stroede told plaintiff of the problem.  Plaintiff knew that she had failed because failing to secure the belt was a safety issue.  Defendant's handbook states that a student's failure of any safety-related criteria will require the student to retake the exam.

On February 23, 2012, Stroede emailed plaintiff to notify her that she had failed the exam and had two weeks to retake it.  On February 28, 2012, plaintiff retook the exam. This time, the height of the mat table was different from what it had been on February 22, but Stroede did not tell plaintiff about the change.  During the exam, plaintiff ran over Stroede's left foot with a wheelchair.  Later, when plaintiff positioned  Stroede on the mat table, plaintiff noticed that Stroede's feet were dangling, which plaintiff knew was a safety issue.  However, plaintiff did not reposition Stroede or adjust the level of the table with the crank.  (The parties dispute whether plaintiff had been trained on adjusting the tables.) Later that evening, Stroede informed plaintiff that she had not passed the exam because of "substantial safety issues."

Under defendant's rules, which are set forth in the student handbook, a student may retake one practical exam course each year.  After the failure of the second exam, the student is dismissed from the course.

8

On March 1, 2012, McNall informed plaintiff in an email that she would not be able to go to the clinic for Clinical Practice 1 and she would not be able to progress in her Neuromuscular Rehabilitation course.  In addition, McNall wrote:

> You are not being dismissed from the program at this time. You are welcome to continue in Musculoskeletal Rehab and Cardiopulmonary Rehab.  It is your responsibility to either finish out the semester and essentially fail clinical practice 1 and Neuro Rehab, or withdraw from these courses. . . .  Because you will not pass Neuro Rehab, you will be withdrawn from the program and not able to progress. In order to be able to return next Spring (if you choose), you will need to write an appeal for reentry into the program as outlined in Policy 6.8 in your student handbook.

At the end of the semester, plaintiff withdrew from the program and transferred to Western Technical College in La Crosse, Wisconsin, to finish her degree.


OPINION

The scope of plaintiff's claims under the Americans with Disabilities Act and the Rehabilitation Act is not immediately apparent from a review of the parties' briefs.  For example, in the introduction to her brief, plaintiff seems to be framing her claim as one for retaliation.  Dkt. #24 at 2 ("McKee's decision to report the discriminatory behavior of a particular MATC instructor had a severely detrimental effect on her academic career, and her financial and emotional well-being."); id. at 3 ("McKee's decision to stand up for what is right, and report this instructor's discriminatory and harassing behavior would ultimately get McKee dismissed from the PTA program at MATC.").  However, the argument section of her brief is titled, "McKee Discriminated Against by MATC on Basis of Disability."  Id. at 20.  In other parts of her brief, she refers to both "discriminatory and retaliatory

behavior," id. at 39, but she does not treat these as separate claims.  Further, she does not cite particular provisions of the ADA or the Rehabilitation Act in her brief or her complaint to clarify the basis for her claims.  Defendant's brief suffers from a similar problem:  it refers to both alleged discrimination and retaliation in its briefs without differentiating the two theories.

Because both sides seem to assume that plaintiff is raising both discrimination and retaliation claims, I will do the same, but the claims are not identical.  Plaintiff cites generally to Title II of the ADA, which applies to public entities.  (Defendant does not deny that it is a public entity within the meaning of the ADA, so I will assume that it is.)  With respect to her discrimination claim, I assume that plaintiff is proceeding under 42 U.S.C. § 12132, which states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  The Rehabilitation Act includes a similar provision.  29 U.S.C. § 794(a).  See also CTL ex rel. Trebatoski v. Ashland School District, 743 F.3d 524, 528 (7th Cir. 2014) (treating § 12132 and 794(a) as imposing same standard for liability).

Title II of the ADA does not include a retaliation provision.  However, Title IV includes a provision that states, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).

10

Although the Court of Appeals for the Seventh Circuit has never considered whether §

12203(a) applies outside the employment context, I conclude that it does because the

language of the statute is not limited to employment and the remedies provision in §

12203(c) refers expressly to Title II.  Torrence v. Advanced Home Care, Inc., 08-CV-2821,

2009 WL 1444448 (N.D. Ill. May 21, 2009) (citing Popovich v. Cuyahoga County Court

of Common Pleas, 276 F.3d 808, 816 (6th Cir. 2002); Amir v. St. Louis University, 184

F.3d 1017, 1025 (8th Cir. 1999); Weixel v. Board of Education of City of New York, 287

F.3d 138 (2d Cir. 2002); Shotz v. City of Plantation, Florida, 344 F.3d 1161, 1181 n. 31

(11th Cir. 2003)).  In contrast, the Rehabilitation Act incorporates § 12203, but only in the

context of a "complaint alleging employment discrimination." 29 U.S.C. § 794(d).  See also

Maxwell v. South Bend Work Release Center, 3:09-CV-008-PPS, 2011 WL 4688825 (N.D.

Ind. Oct. 3, 2011) (concluding that Rehabilitation Act did not authorize retaliation claim

against public entities).  Accordingly, I cannot allow plaintiff to proceed on a retaliation

claim under the Rehabilitation Act.

One obvious difference overlooked by the parties between a retaliation claim and a

discrimination claim is that a discrimination claim applies only to a "qualified individual

with a disability," but a retaliation claim applies to "any individual" who has engaged in

protected activity.  Both sides have assumed that plaintiff must prove that she is an

individual with a disability to prevail on both discrimination and retaliation claims and both

sides have ignored the question whether plaintiff engaged in protected activity.  Although

I have reservations about plaintiff's ability to prove either of these requirements, I need not

resolve those questions.  Even if I assume that plaintiff is disabled within the meaning of the ADA and the Rehabilitation Act and that her discussions with Stroede and McNall qualify as protected activity under the ADA, plaintiff has not adduced evidence from which a reasonable jury could find that defendant discriminated against her because of any disability or protected activity.  Bass v. Joliet Public School District No. 86, 746 F.3d 835, 840 (7th Cir. 2014) ("[W]hen all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination.").

Plaintiff's primary claim seems to be that defendant violated her rights by forcing her out of the physical therapy program.  However, it is undisputed that, under defendant's policy, a student such as plaintiff who failed the same test twice would be dismissed from the program.  Plaintiff points to no student who has received an exception to that policy. Instead, she cites her own testimony that she had "been told by two other students that were in jeopardy of being dismissed from the program because they . . . had failed four exams that if they failed a fifth, which would be grounds for them being out of the program, that Wendy [McNall]—they would work with them to make sure that they could finish and graduate." Plt.'s Dep., dkt. #14, at 100.   Presumably, plaintiff is referring to a policy in which a student is dismissed if he or she fails five different exams over the course of the program. Dft.'s PFOF ¶ 130, dkt. #19 ("Students are allowed a total of four practical examination retakes for the entire program. Upon failure of the fifth practical examination, the student will be dismissed from the program.").

There are three problems with plaintiff's testimony.  First, plaintiff is discussing a

different policy from the one that required her dismissal.  Second, plaintiff does not say that the other two students ever actually received an exception to the policy, only that McNall told them that she "would work with them" if they failed a fifth test.  Finally, and most important, plaintiff's testimony is hearsay and inadmissible under Fed. R. Civ. P. 56 because she does not have personal knowledge of what McNall said.  MMG Financial Corp. v. Midwest Amusements Park, LLC, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").  Accordingly, I cannot consider plaintiff's testimony as evidence that supports her claims.

Plaintiff also seems to allege that she failed the two exams because of Stroede's discriminatory or retaliatory motives, but the basis for plaintiff's belief is not clear.  With respect to the first failed exam, plaintiff admitted during her deposition that her failure to secure the gait belt was "a safety issue, so you know if you don't do the gait belt, there's an immediate fail there."  Plt.'s Dep., dkt. #14, at 93.  She does not point to any evidence that would call into question her grade on that exam.

With respect to the second exam, plaintiff admits that she ran over Stroede's foot with a wheel chair and that she failed to adjust the mat table to allow Stroede's feet to rest on the floor, which is another safety issue.  Again, plaintiff does not deny that her mistakes justified a failing grade on the exam.  Her only argument is that Stroede "made" her fail by changing the height of the table between the first and second exam.  However, it is obvious that a practicing therapist cannot expect identical conditions each time she sees a patient. Even if I assume that it was Stroede who changed the height of the table, I see nothing

suspicious about a minor alteration on a matter that plaintiff would be likely to face on a regular basis after graduation.

This leaves plaintiff's contentions that Stroede violated the ADA and the Rehabilitation Act by (1) changing one of plaintiff's written exam scores; (2) requiring her to remediate that exam even though she passed it; and (3) placing her on a professional behaviors plan after the February 1, 2012 incident.  With respect to the exam score, it is undisputed that Stroede changed it from an 84 to an 82, but plaintiff does not point to any evidence calling into question Stroede's explanation that she had made an error calculating plaintiff's grade, so a reasonable jury could not infer an improper motive for the change.

With respect to the remediation requirement, plaintiff points out that the school policy did not require remediation unless the student scored less than a 78, but Stroede changed the requirement to include a grade of 82, the score Stroede gave plaintiff.  Stroede's explanation is that she required anyone with a C grade to remediate her score because of the "proximity of the clinical rotation."  Dft.'s PFOF ¶ 101, dkt. #19.  In addition, defendant points out that plaintiff was not the only student who was required to remediate her score and that at least one other student received an 82 on the exam.  In response, plaintiff says that Stroede's actions are suspicious because plaintiff had never before been required to remediate a score over 78.  Plt.'s PFOF ¶ 91, dkt. #25.

Although it is understandable that plaintiff would suspect that Stroede's decision was more than just a coincidence, even if I assume that Stroede raised the bar with plaintiff in mind, it does not follow that Stroede was trying to discriminate against plaintiff.  Generally,

14

the purpose of remediation is to improve performance, not to punish.  In fact, Stroede encouraged *all* the students in the class to engage in remediation, regardless of their scores. Although neither side explains what plaintiff's remediation entailed in this instance, plaintiff does not suggest that her dismissal had anything to do with the remediation requirement and she points to no other adverse consequences that she suffered because of the remediation. Accordingly, I conclude that it cannot serve as the basis for a discrimination or retaliation claim.  Cf. Davis v. Time Warner Cable of Southeastern Wisconsin, L.P., 651 F.3d 664, 677 (7th Cir. 2011) (concluding that performance improvement plan was not sufficiently adverse to sustain retaliation claim); Cole v. Illinois, 562 F.3d 812, 816-18 (7th Cir. 2009) (same).

With respect to the professional behaviors plan, again, plaintiff does not suggest that it contributed to the decision to dismiss her, so it is not clear that the plan was sufficiently adverse to give rise to an independent claim.  In any event, plaintiff's evidence of discrimination is slim.  First, she relies on the timing of Stroede's decision to place her on the plan, which was the same day that plaintiff spoke to McNall about the incident. However, it was also the day after the events that Stroede cited as the impetus for the plan, so the timing cannot be described as suspicious.  By plaintiff's own assertion, Stroede made it clear in her conversation with plaintiff *before* plaintiff spoke to McNall that plaintiff's behavior needed to be addressed.  Morgan v. SVT, LCC, 724 F.3d 990, 998 (7th Cir. 2013) ("Where, as here, there are reasonable, non-suspicious explanations for the timing of [the adverse act], we will not deny summary judgment solely on the strength of this one point.").

Second, plaintiff says that one of her classmates "cried multiple times" in Stroede's

15

class, but was not placed on a professional behaviors plan. Plt.'s PFOF ¶ 111, dkt. #25. However, plaintiff provides no context for the other student's behavior and she cites no evidence that Stroede placed plaintiff on a professional behaviors plan because she cried, so that other student is not similarly situated to plaintiff. (In fact, neither side says in its proposed findings of fact that plaintiff cried during the February 1 incident.) Rather, Stroede believed that plaintiff had disrupted the class and acted unprofessionally. Even if I agreed with plaintiff that Stroede overreacted to the February 1 incident, that in itself is not a basis for a claim under the ADA or the Rehabilitation Act.

Finally, I do not understand plaintiff to be raising a separate claim about Stroede's conduct toward plaintiff during the February 1, 2012 incident. Rather, I understand plaintiff to be alleging that Stroede's conduct on February 1 is evidence of her discriminatory intent. Again, however, even if I accept plaintiff's view that Stroede acted too harshly, plaintiff has not adduced any evidence that Stroede's behavior was motivated by hostility toward plaintiff's tremor. When Stroede reprimanded plaintiff on February 1, it was not simply because plaintiff lost her balance, but because she was disrupting the class by laughing and talking loudly. In fact, plaintiff does not allege that Stroede even knew that plaintiff had a tremor until *after* this incident when another student mentioned plaintiff's condition. Thus, even if Stroede was "mocking" plaintiff as plaintiff believes she was by mimicking plaintiff's movements, this would show that Stroede was insensitive and mean-spirited, but it would not be evidence of discriminatory intent. Accordingly, I conclude that defendant is entitled to summary judgment on plaintiff's federal claims.

16

When defendant removed this case from state court, it relied solely on 28 U.S.C. § 1367 as a basis for exercising supplemental jurisdiction over plaintiff's state law claims. Under § 1367(c)(3), the general rule is that the court should decline to exercise supplemental jurisdiction over state law claims when all the federal claims are dismissed before trial. Cadleway Properties, Inc. v. Ossian State Bank, 478 F.3d 767, 769 (7th Cir. 2007) ("When the federal claim drops out before trial . . . and only the supplemental jurisdiction provides any basis for decision, then remand is presumptively appropriate."); Groce v. Eli Lilly & Co., 193 F.3d 496, 501 (7th Cir. 1999) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").  Because the parties do not identify any reason that I should depart from the general rule in this case, I am remanding plaintiff's claims for breach of contract and negligent infliction of emotional distress to state court.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendant Madison Area Technical College, dkt. #17, is GRANTED with respect to plaintiff Kirsten McKee's federal claims.  In accordance with 28 U.S.C. § 1367(c)(3), plaintiff's state law claims are REMANDED to the Circuit Court for Dane County, Wisconsin.  The clerk is directed to

enter judgment accordingly.

Entered this 22nd day of May, 2014.

BY THE COURT:

/s

BARBARA B. CRABB
District Judge